Your Honor, may it please the Court, Counsel, and Jim Westwood, Attorney for Pacific Foods of Oregon. With me at counsel table is Brian Coluccio. In one of the last pronouncements that's made in this case, the District Court said that this was primarily a breach of contract case and only secondarily a claim for misappropriation of trade secrets. The Court was mostly right. Actually, this is a case in which trade secrets play no role. And the contract claim will have to be either dismissed or sent back for a retrial because of several evidentiary and instructional mistakes that were committed by the District Court. Because of my limited time, I won't touch on every point, and I certainly invite questions from the Court as we go along to help focus the argument. The trade secret claim should have been dismissed, first and foremost, because the Oregon Uniform Trade Secrets Act controls the trade secret claim, and in that control it does away with the claim. The confidentiality agreement between Pacific Foods and the predecessor to Sunrich Food Group defines what is needed to make Sunrich's pricing and margin data confidential, sufficient to support a claim for misappropriation of a trade secret. The requirement of the contract is that Sunrich, and this First Light Foods, or FLF actually, was the party predecessor to Sunrich, had to mark any documents that it wanted confidential, quote, confidential information, FLF. It didn't do that, and because of that, the party's contract controls the confidentiality. We've cited this in our brief, in particular in our reply brief. The Uniform Act establishes the degree of confidentiality that's required. There is no dispute that the information in question was not so marked. There's another aspect to this. The information under the Oregon Trade Secrets Act, even assuming that the contract doesn't control here, must be that which is subject to efforts that are reasonable under the circumstances to maintain its secrecy. The disclosure may be entirely reasonable in the eyes of, in this case, First Light Foods, which actually did disclose this confidential information to Sunrich and to others when Sunrich was considering buying First Light Foods. The disclosure, again, may have been entirely reasonable. That's not what the statute says. The statute requires that in order to be a trade secret, the information must be the subject of efforts which are reasonable under the circumstances. There were no efforts made. Couldn't you make efforts to keep information generally confidential but still disclose it to a potential purchaser? Certainly, you could. And a reasonable effort might be a confidentiality agreement. There's nothing in the record to indicate there was any such agreement. Yes, I agree, Your Honor. But the point is that Sunrich is arguing this disclosure was reasonable. The focus is were the efforts reasonable, and there is no evidence that they took any efforts. So as to the summary judgment ruling, initially, pretrial, the claim should have been dismissed. But even later, when this half-gallon opportunity claim had been added later, which would have been subject to claim preclusion had the summary judgment been granted, but the half-gallon opportunity, the knowledge that Trader Joe's was phasing out its half-gallons with West Prairie, a former supplier, and wanted to bring in half-gallons from someone else, that knowledge also was not a trade secret because the only evidence is that the inquiry, when it was made by Trader Joe's, was first of all made to Pacific, my client, not to Sunrich. It was made in the presence of representatives from both parties at the November 1998 meeting. This couldn't have been a trade secret as between the two of them. Remember, too, that at all times, and the Court so ruled, that Pacific was privileged to compete with Sunrich. And finally, if we need to get this far, there was the failure to establish damages under the Oregon Trade Secrets Act. Sunrich's loss, as testified to by its expert Joseph Kenyon, was the result of the alleged breach of contract. Mr. Kenyon testified that, oh, my goodness, because Pacific Foods was doing these things to us, we had to terminate the contract. And as a result of our having to terminate the contract, they forced us to do it, we weren't able to continue our relationship with Trader Joe's, and we lost our profits. It's a contract claim. Nor was there any evidence of any enrichment by Pacific as a result of this, which would be the other element of a wrongful misappropriation of trade secrets damages. Now, with respect to the trade secrets as an alternative for a new trial, we've talked about the untimeliness of the Kenyon report, the second Kenyon report. The first one, the February 27, 2003 report, didn't mention trade secrets, didn't mention punitive damages. Sunrich has said, well, there was inter alia in there, and this was- It said our other claims. Sorry? It said contract, this or that, and other claims. And other claims, which it then- It wasn't that adequate to- Well, it then detailed these other claims as the unlawful competition and the contract claim. It did not once mention any misappropriation of trade secrets. But beyond that, the exclusion of the later report, the December 19th report from evidence, which is what the court should have done, would not have taken away the right of Sunrich to put on its expert. To have him testify from his February 27th report and say, oh, yes, I meant trade secrets. But the cross-examination would have been much different. Rule 27- Excuse me, Rule 26 is essentially self-executing in this regard. Although this is an abuse of discretion standard, in this context, the court, I think, must reverse this on the basis that the Kenyon report, the later Kenyon report, was not admissible, should have been excluded, and he should have been required to testify from his first report. Another basis for a new trial on trade secrets, Exhibit 704, open disclosure of First Light Foods pricing and margins. Again, reasonable efforts to maintain confidentiality, not reasonable disclosures are the test. And these exhibits, which were excluded by the trial court, were the only demonstrable exhibits that would have shown to the jury that First Light Foods was indeed making these disclosures when it was claiming at the same time that these were confidential information. As to the procedural aspects of this, the no foundation argument, I think it's a nonstarter because the objection was purely on relevance. And the need for an offer of proof, well, where there's testimonial evidence, that's the basis for an offer of proof. As long as the court knows the substance of the evidence, that's enough. No offer of proof is needed. And here, where these are documents. What about foundation? Well, the objection was on relevance. And the foundation is something that we would have to show. We're not saying that these documents had to be admitted. What we're saying is, on retrial, give us a chance to establish our foundation. The court cut us off before we could establish a foundation because the objection had been on relevance and the documents were excluded on that basis. Relevance is the threshold you get to foundation later. With respect to the contract claim, I submit that that claim, too, should have been dismissed because there was no evidence. First of all, the breach of contract was for failure to bargain in good faith over the pricing for the nonfat coffee and chocolate-flavored drinks. There was no evidence that we needed to bargain over those because product was defined, or requirements product, was defined as what's in Exhibit B to the packing agreement. Exhibit B was the products that had been initially determined. This also gets into an argument I'm about to make with respect to the instruction because the contract did not provide for these new products.  The only way to modify the contract was in writing, signed by both parties. No evidence that there was a modification. As a result, the breach of contract, which was the failure to bargain over pricing in good faith for these three new products, was not a breach of the contract. The contract simply didn't cover them. But beyond that, even if it did, we're entitled to a new trial on the contract claim, principally, I think, because of Exhibit 719, which was excluded by the trial court. The January 2001 letter, five months, six months, before the notice of breach was finally delivered to Pacific Foods, in January 2001, Sunrich's lawyer, writing to First Light Foods Jenkins and Gournoyd's lawyer, said, this contract's been breached. We want you to deliver that notice right away. Do it. Well, that's because the contract required in paragraph 18 a timely and detailed notice so that there'd be time to cure. Actually, in the event, this action was filed on the very day that the notice was finally delivered to Pacific Foods. That would be evidence either of no liability at all or evidence of no damages after January up to July. And those damages, which were put on at trial, were substantial. I'm running low on my time. I would like to reserve some for rebuttal. But I do want to touch briefly on the lost volume seller claim, which was the counterclaim on the contract by Pacific Foods. The Court imposed the draconian sanction of dismissal without examining the Malone v. Postal Service factors that this Court says it should have And without in particular going into the three-part inquiry under Malone Factor V prior to making a dismissal. Did it explicitly discuss less drastic sanctions? No. Did it discuss alternative sanctions before dismissal? No. And did it warn of dismissal as a possibility so that counsel would be on notice that dismissal might be done here? And the answer again is no. So notwithstanding the fact that, as we've indicated in our briefs, there really was no violation of the order of the Court, the Court's dismissal was also improper, and this needs to be sent back again for a trial. I've touched briefly on the instructional aspect. I won't go further on that. That's the basis for a new trial on the contract claim. And unless the Court has questions with regard to the attorney fee cross-appeal of Sunrich, I'll reserve the remainder of my time for rebuttal. I don't see any. Thank you, counsel. You have about four minutes saved. Thank you. We'll hear from Sunrich at this time. Mr. Barch. Good morning, Your Honors. If it may please the Court, my name is Eric Barch. I represent Sunrich Food Group with me at counsel table with Sarah Strobel, who is also on the briefs. There are two appeals, as Mr. Westwood alluded to, to the Court that are present for argument today. The first relates to an appeal from a jury verdict that was issued in the District Court of Oregon in June of 2004 with judgment following in August of 2004. And then our appeal from a final order ruling on our attorney's fees relating to the Oregon Trade Seizure Statute provision. That final order, I believe, was issued on November 5, 2005. Your Honor, just briefly with respect to Mr. Westwood's arguments concerning the verdict, all of what I've heard today is essentially a challenge to the sufficiency of the evidence and the evidence that supports both the trade secrets verdicts and the contract claims. There were basically contract claims, an allegation of the breach of good faith and fair dealing, a breach of the requirements provision of the packing agreement, and then an allegation that Pacific Foods had misappropriated and used to its advantage Sunrich's trade secrets, which were comprised of pricing information and its knowledge of an opportunity to sell a new product that was not yet of the public domain at the Trader Joe's customer that we briefed in our materials. In our briefs, Your Honor, we addressed Pacific Foods' arguments essentially by claim. I'd like to talk today a little bit about those arguments by the standard of review. Could I ask you one question? Yes, Your Honor. About the container point, the idea that Trader Joe's wanted a certain size container. If Pacific Foods was at the meeting where that was said, how is that a trade secret? Well, at that time, Your Honor, there was really a triangular relationship between the customer, the manufacturer, and the trademark owner. And at trial, Pacific Foods, in fact, raised that issue as one of the reasons why Sunrich's trade secrets should not be deemed to have satisfied the element of the statute that they be kept reasonably safe and secret from the public at large. On cross-examination, Pacific's chief financial officer testified that he understood pricing and new product opportunities to be something that is secret and is kept secret by his company. Of course, in our relationship with our manufacturer, that is my client's relationship, different ideas are communicated to them in the course of ordinary business because we hire them as a contract manufacturer to produce the goods that we sell to our customer with our brand name. So you're saying because they were party to the packing agreement with your client, they could be present at the time Trader Joe's would say something confidential, and it's still confidential? That's correct, Your Honor. There was an understanding among the parties to the agreement. This was an issue that was raised at trial. The jury concluded that question in our favor, of course, on the special verdict form, that these parties all understood the secret nature of the business in which they were involved, that Sunrich's pricing information and the ideas that they were developing in concert with the customer were the kinds of secrets and ideas that ought to be protected from general disclosure and dissemination. Was that in writing anywhere? It was not, Your Honor, and that is the fatal point with respect to Mr. Westwood's first argument relating to the confidentiality agreement. There were no secrets that were transmitted to Pacific Foods in some tangible form. The confidentiality agreement, which was appended to the packing agreement, indicates that First Life Foods, who is Sunrich, shall designate any and all documents or other tangible materials containing FLF confidential information by marking, stamping, or affixing such materials with the legend confidential information FLF. In fact, at trial, Pacific was unable to find any documents offered none as exhibits and could offer no testimony that Pacific had ever received a tangible document or other material item that contained a Sunrich trade secret. Pricing information and new product opportunities were always discussed, according to the evidence, in an oral fashion. There is no requirement under the confidentiality agreement that a preface or warning be attached at the time the communication is made. Would you explain to me what your breach of contract claim was all about? What did you claim they did to breach the contract? There were two claims that appear on the special verdict form. The first had to do with a breach of the implied covenant of good faith and fair dealing. There was a pricing provision in the contract that required the parties to resolve prices with respect to new products introduced after the date of the agreement and to have those negotiations pursuant to the terms of that clause attached to that under article. What provision of the contract are you referring to? I believe that would be paragraph 5 of the packing agreement or perhaps it's paragraph 4. I don't have the excerpts of records cited in front of me at this moment, although I do have the agreement if you care to have me read it to you. I don't see where it says new products. It does not say new products. I thought you said new product. That would be found within the definition of products itself in the packing agreement. Where is the definition of product? Products in the packing agreement, Your Honor. Is that paragraph 1? I believe it's paragraph 1. That's correct. And you'll see that the contract envisions the inclusive language of any and all products that are being manufactured or might be sold, distributed, or developed by First Life Foods and sold to Trader Joe's fall within the provisions of this agreement. The important language there, of course, is the inclusive language, and when the trial court was asked to construe this agreement at the summary judgment phase, concluded quite simply that the agreement was unambiguous and applied without reservation to the fat-free coffee and strawberry products that were introduced shortly after the agreement was executed. And again, this goes to the nature of the close and confidential relationship that the paired parties shared at the time. We had two weeks of evidence that spent a lot of the course in the jury's time helping the jury understand what this relationship was, what it meant with respect to the contract agreement, and then how the Trade Secrets Act impacted that and the restrictions that it placed on Pacific Foods from using this confidential information in unfair competition. Mr. Barch, how about the sanction, if it is a sanction, of dismissing the lost volume seller claim in the counterclaim? That's not a sufficiency of evidence issue. That's an issue, I guess, under our precedent, whether that dismissal was proper. That's correct, Your Honor. We are getting away now from the discretion of the trial court. Actually, we are moving away from the sufficiency of evidence to the discretion of the trial court. It is a Rule 37 standard, and what Rule 37 has applied in this particular instance is that if a party refuses to disclose information that is sought in discovery, that party is precluded from using that information as evidence at trial. In this case, and the record is rather heavy with citations to problems that we had with Pacific Foods disclosing evidence of its selling capacity or its manufacturing capacity. In a claim that Pacific was pretending to bring under the Uniform Commercial Code, Article 2, Section 706, there are two types of damages that a seller might ask to have. The presumptive damages would be the difference between the selling price of the product it did not sell and the replacement product it did sell. The evidence that Pacific produced in discovery was that the replacement products it began selling after our product left its manufacturing facility were, in fact, more profitable. Didn't the jury necessarily find that your client did not reach the contract? That would be the other ground, Your Honor, is moving away from the merits and simply looking at the question of justification under the Wasserberger decision at state court, this being a state court case in Oregon. Whatever obligation that Pacific might have had to continue manufacturing under this agreement that had a five-year term was extinguished by Pacific's repudiation of that agreement through a breach of the covenant of good faith and fair dealing and breach of the best efforts obligation that attaches with respect to the manufacture of the half-gallon product. Unless there's additional questions concerning the main appeal, I do have my appeal pertaining to the fee award from the district court. I'd like to move forward with that portion of my presentation at this time. No, that's absolutely up to you. I'd simply point out that your opponent didn't argue the merits of that, so if you don't raise it, he can't respond to it, but if you do raise it, he can. That's a point of order that I hadn't contemplated until I approached the Speaker's stand, Your Honor. Absolutely up to you. Since I have the burden on that, Your Honor, it would probably be in my best interest to speak about it, at least just briefly. Your Honor, the other appeal that's before you today, which I believe carries, at least from my perspective, more interest and more weight, would be our appeal from the Court's November 5, 2005, order on our attorney's fees application. We had two go-arounds at the district court relating to that fee application. The first time we filed our fee application, we sought fees for all the claims that were brought in the case. We had a trademark claim that was disposed of, I should say, as a counterclaim of Pacific Foods that was disposed of at the summary judgment stage. We had our contract claims that survived the trial. We had our trade secrets claim, which I should point out was a claim that was pleaded initially in the first complaint and also the amended complaint. And then we had a series of tort claims that overlapped with the kind of damages that we sought with respect to our trade secrets claim. My understanding is the district court restricted your fee recovery to the claims you prevailed on. That's correct, Your Honor. The district court asked us to apportion the kinds of fees that we or the fees that we would recover to the trade secrets claim, and that is our first assertion or assignment of error with respect to that order. With respect to Judge Hagerty's ruling that we should limit our fees to the trade secrets claim, we believe the court erred as a matter of law by not allowing sunrich or by at least denying sunrich. The reason this is on appeal is that there was an 80 percent reduction from the reduced amount that we submitted with our second application. Just for history, we had about a $1.5 million or $1.1 million fee claim relating to this four-year, five-year case, which was reduced to about an $800,000 claim. Judge Hagerty awarded $175,000 in legal fees. And his explanation for doing that was that our claim did not appear to be sufficiently limited to the trade secrets claim. Looking at the material that we submitted, of course, it was limited to the trade secrets claim and the other two categories of fees that were entitled to recover under Oregon law and under the jurisprudence of this circuit. One would be what we call overlapping or mixed fee claims, which is where there's a common course of conduct or common facts among all the claims. If those claims share that denominator, then... Work that would have been done even if the claims hadn't been brought. Exactly, and that's the Bennett v. Baugh opinion in Oregon. The other would be the generic type of fees. The origin of the idea of generic fees, I believe, comes to us from the Hensley opinion, and in Hensley, the court said that and recognized that trial counsel spends most of its time working on the everyday activities of a case. Those activities cannot be apportioned to any particular fee. In Judge Hagerty's order, he clearly disallowed what I call the mixed fees, fees that were related to claims and fact investigation discovery that related to claims that were in common with the trade secrets claim, and there can be no denying that they had commonality because that is why Judge Hagerty preempted those claims at the summary judgment hearing. Also true with respect to the mixed fee claims. The court did not allow those, and under the cases cited in our materials, it was the court's obligation, both under Oregon law and precedent of this circuit, to allow those fees as well. Secondly, our other assignment of error, Your Honors, has to do with the court's failure to explain how its allegation in the second page of its opinion relating to presumed or assumed generalized time entries, multiple attorney conferences, and duplication of effort somehow contributed to the court's decision to reduce our already reduced fee application by another 80%. This court, upon finding an order of this kind, will vacate and remand it and ask the district court to set forth expressly the reasons that reveal the basis of its decision and the grounds on which that decision is based, both in the Furland case that we cited and the Mattel case. Those cases reverse the district court for failing to make those kinds of findings. As is true in the Oregon Supreme Court, the web, or I'm sorry, the Court of Appeals case that we cited, the CAM Concepts case, and the Weber v. Sloan case, I believe, at the Oregon Supreme Court. Those two courts also reversing for, and back to error number one, for problems relating to a failure to award the commonality claims and the generic claims. I see you're out of time. I am, Your Honor. Thank you so much for your argument. We'll hear a rebuttal at this time. Thank you much. Counsel? If the Court please, with respect to Mr. Bartsch's statement this morning that there were no documents delivered regarding pricing to Pacific Foods, I did not see it in his answering brief, and it is a surprise to me this morning to hear that. I cannot, as I stand here, point you to documents that were delivered. I suppose what Mr. Bartsch is essentially saying is that the parties were orally passing this information somehow. I find it hard to believe, but I cannot tell the Court in all honesty that there were documents that I can point to. I think the burden, however, would have been on Pacific, on Sunrich, to establish that the documents that it did provide that had any pricing information contained that. I then also would want to add that we still get a dismissal of the trade secrets claim, however that may shake out because of the fact that there was no reasonable effort made to conceal the confidentiality of the information that clearly, documentedly, was produced by Sunrich or its predecessor to other parties. Mr. Westwood, why isn't the definition of product broad enough to cover the other flavors? Product is the requirements, is part of it, and I say, I submit, no, it was not broad enough to cover the other flavors because under paragraph 5, product is defined as that which is in Exhibit B. If I may. It says the sales price for products are set forth in Exhibit B. Yes. But the definition of product is in paragraph 1. As used in this agreement, the product, excuse me, as used in this agreement, the term, quote, product means any soy, rice, or… Well, I submit it would require a modification of the contract because the sales price for the product is in Exhibit B, and if you're going to have new products coming in, you'd need to modify the contract, and it wasn't done. On the attorney fees issue, remember that the court has broad discretion regarding whether or not to allocate attorney fees, and the default is allocation. That's what the court did here. It may depart from it. It has the authority to depart from it. The district court did not. Did the district court explain how it came up with the number it picked? No. There were any number of possibilities. Isn't that a fatal defect? The fact that the court did not give detailed findings on this rests on Sunridge for not having requested additional findings. Does the judge have to say I came up with $175,000 by multiplying X times Y or something, or can he just say I pulled it out of the air, or it seemed good to me, or it came to me in a dream, or does he have to say something? We've indicated in our brief some of the ways that that could have been done, but the point is that the court had the discretion to do it. If Sunridge was dissatisfied, it had the obligation to request additional findings to make a record from which it could appeal. It didn't. If the court has no further questions, I believe I will take my argument. I don't see any. Thank you both very much. Thank you, Your Honor. This is a very interesting case, and it's submitted for decision.
judges: Hawkins, Silverman, Gould